# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

**Kelley Coons**                )
                                )
    Plaintiff,     )
                                )
 v.                             )   No. 10 C 4214
                                )
**Walsh Construction Company,** )
                                )
    Defendant.     )
                                )

## MEMORANDUM OPINION AND ORDER

On July 7, 2010, Kelley Coons filed suit against her former employer, Walsh Construction Company, alleging that she was terminated from her job as a Safety Manager because of her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 *et seq*. Now before me is defendant's motion for summary judgment, which I grant for the reasons that follow.

I.

The following facts are undisputed, except where noted. Plaintiff applied for a position as Safety Manager with defendant in late 2006. After interviews with Greg Pipala, a Senior Safety Manager in defendant's Building Division, and others, plaintiff was offered and accepted the position. Hank Botterman, Walsh's Corporate Safety Director and Pipala's immediate supervisor, expressed reservations about hiring plaintiff because he felt "she may not be qualified for the job." Pipala Dep., Pl.'s SOF, Exh. 1,

30:1-2. *See also* Botterman Dep., Pl.'s SOF, Exh. 2, 20:22-23 ("[Pipala] was much more confident in her than I was.") Pipala nevertheless decided to hire plaintiff, explaining "[h]er experience was not that strong, but I felt that she could do a good job given some mentoring and some education along the lines of safety courses." *Id*. at 30:5-8. Throughout her employment with defendant, plaintiff reported directly to Pipala for her project assignments and her performance reviews.

At the time of her termination in September of 2009, plaintiff was the only woman among the forty to fifty Safety Managers employed by defendant companywide (i.e., across the roughly twenty states in which defendant had projects). The other Safety Managers reporting to Pipala in the Building Division were Raymond Williams, Steve Levario, and Todd Ross. Levario, who worked out of Phoenix, Arizona, has a Certified Health Safety Technician (CHST) designation. Williams has an Associate Safety Professional (ASP) designation, which is a level of designation higher than a CHST designation, and which requires a college degree.[1] Plaintiff had neither of these designations (having taken and failed the test for the CHST designation during the course of her employment), nor did she have a college degree. Ross also had neither designation, but

---

[1]It is not clear from the record that Levario and Williams had obtained their respective designations before plaintiff's termination, but this issue is immaterial to my disposition of defendant's motion.

2

he did have a college degree, and he had more seniority than plaintiff at defendant, as did Williams.

Plaintiff's first assignment as Safety Manager was on a job referred to as the Rosemont Intercontinental Hotel project. Beginning July 21, 2008, plaintiff was assigned to work sixty percent of her time at a project called the Wilson Yard project, while she remained on the Rosemont project for the remaining forty percent. (Technically, the evidence is that her "project cost allocation" was split sixty/forty between the two projects, but there is no basis in the record to controvert the logical assumption that this corresponds roughly to how her work was divided.) For one month, from September 22, 2008 to October 22, 2008, plaintiff was transferred to (again, her "project cost allocation" was 100% to) a project called the Legacy project. She was then transferred back to the Wilson Yard project, where she remained until her termination in September of 2009. She received a raise during this time, on November 18, 2008.

In August of 2009, several of defendant's projects in the Chicago area were nearing completion, and there was no new work coming up in the Building Division.[2] As Botterman testified, "we

---

[2]This assertion is supported by both Pipala's and Botterman's testimony. *See* Pipala Dep., Pl.'s SOF, Exh. 1, at 85:22-23 ("There was no work in the Chicagoland area. We were – We had no new work coming up in our area"); Botterman Dep., Pl.'s SOF, Exh. 2, at 55:5-8. Plaintiff purports to dispute this fact with evidence that at the time of her termination, the Building Division was working on Wilson Yard and two other projects, and that defendant had open

were running out of work for our safety managers." Botterman Dep., Pl.'s SOF, Exh. 2, at 55:5-8. Among the projects nearing completion was the Sherman Hospital project to which Todd Ross was assigned. Pipala and Botterman decided to put Ross on the Wilson Yard project.

Pipala and Botterman wanted to keep Ross--who had seniority in Pipala's group--in the Chicago area for new or larger projects in the future.[3] In addition to his seniority to plaintiff, Ross "had more experience. He had an education. Kelley didn't have a degree. ... Kelley didn't have a lot of safety manager experience and that was a component of the decision." Botterman Dep., Pl.'s SOF, Exh. 2, 58:5-6. Moreover, Ross's "performance [was] one of the best." *Id.*, 55:12. Accordingly, Pipala and Botterman tried to find another placement for plaintiff, and they met with her in late August to discuss transferring her to a project in Fort Stewart, Georgia. The parties dispute precisely what was discussed at that meeting, but plaintiff acknowledges that she was told she needed to move to the Fort Stewart project to stay employed with defendant. Coons Dep., Pl.'s SOF, Exh. 3, at 245:23-246:3. Plaintiff further testified

---

positions for Safety Managers in areas outside Chicago. But none of this evidence controverts defendant's assertion, which is further bolstered by evidence that defendant eliminated two other Safety Managers in the Building Division after plaintiff's termination, leaving Todd Ross as the only Safety Manager in Pipala's group.

[3]Plaintiff purports to dispute this statement with the undisputed assertion that Ross replaced her on the Wilson Yard project. But this assertion does not controvert defendant's statement of fact.

that she understood Ross had more seniority than she, and agreed that her transfer to Georgia was "according to company policy."[4] Plaintiff also stated that she was happy with the terms of the transfer discussed at that meeting. *Id.*, at 246:10-12.

Ultimately, however, plaintiff declined the transfer to Georgia because she was not satisfied with the final terms of the offer, which she claims were less favorable than those discussed at her meeting with Pipala and Botterman.[5] Thereafter, defendant offered the Fort Stewart position to Mark Tulin (a man), who accepted it on the terms plaintiff had rejected.

On September 9, 2009, Pipala informed plaintiff that she would be laid off effective the following day, but that he hoped to be able to rehire her in the future. Although plaintiff understood that she was eligible for rehire, she has not applied for any position with defendant since her termination.

Since plaintiff's termination, Williams was transferred to a project with another division in Louisiana, and Levario accepted a

---

[4] "Q: And it's your understanding Todd Ross has more seniority than you, correct? A: Correct. Q: So, according to company policy, you would be moved to Georgia, correct? A: Correct." Coons Dep., 246:4-8.

[5] Plaintiff denies defendant's statement that she rejected the Fort Stewart offer, claiming that she "informed Greg Pipala that she was accepting the Fort Stewart job offer Botterman gave her" at their meeting. While this distinction could conceivably be relevant in some hypothetical contract action, it has no apparent relevance in the current context, where the salient issue is whether the terms of the transfer reflected gender-based discrimination.

transfer to a project with another division near Oklahoma City, rather than be laid off for lack of work. Todd Ross is the only remaining Safety Manager in Pipala's group.

## II.

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). I must construe the evidence and draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). Nevertheless, to survive a properly supported motion for summary judgment, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To determine whether a genuine issue exists, I must "view the evidence presented through the prism of the substantive evidentiary burden." *Id*. at 254.

It is unlawful, under Title VII, "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's...sex." 42 U.S.C. § 2000e-2(a)(1). A plaintiff can prove sex discrimination under Title VII using either the direct method or the indirect, burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Petts v.*

*Rockledge Furniture LLC*, 534 F.3d 715, 720. Plaintiff proceeds under both.

"Direct evidence of discrimination does not require a virtual admission of illegality." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044. A plaintiff can prevail under the direct method "by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" *Petts*, 534 F.3d at 720 (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004))(internal quotations and citation omitted). But the circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Rhodes*, 359 F.3d at 504 (quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)).

Defendant argues that plaintiff fails to identify sufficient evidence to proceed to a jury under the direct method of proof. Plaintiff responds that the following items in the record amount to direct evidence of discrimination: (1) Botterman's alleged statement, at an unspecified time during plaintiff's employment, "women should not work in the construction industry"; (2) Botterman's alleged statement in February of 2009, after learning that plaintiff had complained about Pipala to the head of plaintiff's business group, "if [you] ever go outside of the Safety Department again and complain to anybody outside of [me], [you] would never have a job with Walsh"; and (3) Pipala's statements, at

7

unspecified times during plaintiff's employment, "All girls struggle with math," "I'll never get a hundred percent from a woman," "Don't get emotional on me. Don't act like a girl," "Don't be hormonal," "Don't PMS. Are you on your period? Because if you are, I don't want to talk to you," and "Oh, blue balls, Oops. Don't say that. Kelley's here. Ha, ha, ha, ha, ha, You're used to that, though, right, Kelley?"

While these statements are, indeed, both obnoxious and inappropriate, I agree with defendant that they are insufficient, taken together, to create a triable dispute over whether plaintiff's *termination* was motivated by discriminatory animus. Plaintiff observes that isolated comments suggestive of gender bias may constitute direct evidence of discrimination if they are "contemporaneous with the discharge or causally related to the discharge decision making process." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999) (internal quotation marks and citation omitted). But plaintiff has not pointed to any evidence to suggest that these comments were either. Plaintiff likens her case to *Sheehan*, in which the Seventh Circuit upheld the jury's verdict in favor of the plaintiff on her claim of pregnancy discrimination. But the comments in *Sheehan* not only reflected stereotypes about pregnant women, they also facially suggested a link between plaintiff's termination and her pregnancy: "If you have another baby, I'll invite you to stay home," and "you're not coming back

after this baby." 173 F.3d at 1045. The remarks in the remaining cases plaintiff cites suggest similar, direct causal relationships. *Hunt v. City of Markham, Ill.*, 219 F.3d 649 (7th Cir. 2000) (mayor and other city officials stated, e.g., that city needed to "get rid of all the old white police officers," and asked one of the plaintiffs, "when are you going to quit so we can bring these young black men up?"); *Schaffner v. Hispanic Housing Development Corp.*, 76 F. Supp. 2d 881 (N.D. Ill. 1999) (vice president of the defendant directed the plaintiff's immediate supervisor to "downgrade" the plaintiff's positive performance review because the plaintiff "was getting close to retirement and [the defendant] didn't want to spend time and energy on her," and made various age-derogatory remarks "immediately before" the plaintiff was demoted).

In reality, plaintiff's case is more similar to *Garcia v. U.S. Postal Service*, 414 Fed. App'x. 855 (7th Cir. 2011), in which the Seventh Circuit concluded that because the plaintiff could not say when allegedly racist comments were made, and the record did not suggest that the comments were made in reference to his termination, the statements were merely "stray remarks" insufficient to create a suggestion of discriminatory animus, "let alone a convincing mosaic." *Id.* at 857-58 (citing *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 781-82 (7th Cir. 2007) ("[S]tray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment.")) Because the comments

9

plaintiff imputes to Botterman and Pipala likewise cannot reasonably be deemed either temporally or causally related to plaintiff's termination, they do not amount to direct evidence of discrimination.

To stave off summary judgment, then, plaintiff must establish a genuine issue of material fact using the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this method, plaintiff must first demonstrate a *prima facie* case of discrimination. The parties agree that plaintiff has satisfied the first three elements of a *prima facie* case: that plaintiff is a member of a protected class, that she was meeting her employer's legitimate performance expectations, and that she suffered an adverse employment action. The fourth and final element requires plaintiff to establish that she was treated less favorably than similarly situated employees outside the protected group.

The parties dispute what plaintiff must show to satisfy this element. Defendant argues, citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612 (7th Cir. 2000), *inter alia*, that plaintiff must identify a male employee whose performance, qualifications, and conduct are substantially similar to hers, but who was treated more favorably. Defendant then argues that none of the male Safety Managers in the Building is similarly situated to plaintiff, pointing to undisputed evidence that their educational backgrounds, certifications, experience, and seniority levels (or a combination

of these qualities) distinguished them from plaintiff in a material, non-discriminatory way. Plaintiff responds that defendant seeks to impose a too-stringent standard to this element of her *prima facie* case, citing *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007), for the proposition that all she must do is demonstrate that defendant "sought someone to perform the same work after [she] left."

Rather than linger on the potentially thorny question of which test is appropriate to determine whether plaintiff has carried her *prima facie* burden, I simply assume that she has done so and proceed to the next step of the analysis, which invites a straightforward resolution of the case. *See United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant.") Regardless of whether plaintiff is entitled to a presumption of discrimination, defendant has articulated a legitimate, non-discriminatory reason for plaintiff's termination--namely, that when defendant's work in the Chicago area was declining, it gave preference on local projects to Ross, an employee with greater seniority and qualifications than plaintiff, and that plaintiff rejected defendant's offer to transfer her to another location. This shifts the onus back onto plaintiff to demonstrate that defendant's stated reason was pretextual. *See*

*E.E.O.C. v. Our Lady of Resurrection Medical Center*, 77 F.3d 145, 149 (7th Cir. 1996) (to rebut presumption of discrimination raised by a *prima facie* case, "[t]he defendant must produce evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.")(Original emphasis) This plaintiff cannot do on the present record.

The record reveals that not only has defendant not hired any new Safety Managers in the plaintiff's division since plaintiff was terminated, it has actually *eliminated* two such positions in the months following plaintiff's termination. Plaintiff seeks to prove pretext with evidence that defendant had projects requiring Safety Managers outside the Chicago area. But defendant *offered* plaintiff an employment opportunity on one of these projects, and she rejected it.[6] Moreover, plaintiff offers no evidence that she was qualified for the remaining positions she claims were available.

Plaintiff next argues that pretext can be inferred from evidence that defendant deviated from its usual procedures by replacing her with Ross on the Wilson Yard project prior to that project's completion. But the evidence is merely that replacing a Safety Manager prior to a project's completion was "uncommon," not

---

[6]Plaintiff also claims that shortly before the Fort Stewart opportunity arose, defendant offered, and plaintiff accepted, a position in Sacramento, but that that opportunity later evaporated. It is not clear that these facts support plaintiff's case at all, but in any event, she offers no authority, nor any reasoned basis, for construing them as evidence of pretext.

12

that it was inconsistent with defendant's procedure. Indeed, plaintiff acknowledged at her deposition that transferring her to Georgia to allow Ross, the more senior employee, to remain in Chicago was consistent with "company policy." Coons Dep., Pl.'s SOF, Exh. 3, at 246:4-8.

The additional evidence plaintiff mentions in passing--inconsistent testimony about the importance of Ross's seniority in the decision to replace plaintiff with him on the Wilson Yard job, the fact that plaintiff and Ross had comparable scores on their 2009 Safety Evaluations, and the fact that plaintiff was the only female Safety Manager defendant employed--is likewise insufficient to allow "a rational factfinder [to] infer that the company lied about its proffered reasons for [her] dismissal." *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 726 (7th Cir. 2005) (quoting *Weisbrot v. Med. Coll. Of Wisconsin*, 79 F.3d 677, 682 (7th Cir. 1996)).

III.

For the foregoing reasons, defendant's motion for summary judgment is granted.

ENTER ORDER:

*[signature]*

**Elaine E. Bucklo**
United States District Judge

Dated: August 18, 2011